**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

MARIA BARNHART,

        Plaintiff,

v.                                  CIVIL ACTION NO.  2:25-cv-00613

CORNERSTONE BUILDING BRAND SERVICES, INC.,

        Cornerstone.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is Defendant Cornerstone Building Brand Services, Inc.'s ("Cornerstone") Motion to Dismiss or Alternatively to Transfer Venue. [ECF No. 8]. Plaintiff Maria Barnhart filed a response, [ECF No. 16], to which Cornerstone replied, [ECF No. 17]. For the reasons below, the Motion, [**ECF No. 8**], is **DENIED**.

I.        **BACKGROUND**

On October 16, 2025, Plaintiff instituted this action against Cornerstone, alleging discriminatory and retaliatory employment actions based on her age. [ECF No. 1]. She asserts claims for age discrimination (Count I) and retaliation (Count II) under the West Virginia Human Rights Act ("WVHRA"), W. Va. Code § 16B-17-1 *et seq.*, and intentional infliction of emotional distress ("IIED") (Count III) arising from Cornerstone's refusal to rehire her and its termination of her contract assignment. *See generally id.*

In October 2006, Plaintiff was hired by Simonton Windows, Cornerstone's predecessor, as an associate product manager. *Id.* ¶ 5. Over time, and through a series of mergers and

acquisitions culminating around 2018, Plaintiff became an employee of Cornerstone. *Id.* ¶ 6. Throughout her tenure, Plaintiff maintains that she consistently performed her job duties in a satisfactory manner. *Id.* ¶ 7.

In November 2022, Plaintiff entered into a Voluntary Separation Agreement ("VSA" or "the Agreement") with Cornerstone, in which she received 20 weeks of base salary, totaling $36,489.29, in exchange for voluntarily ending her employment. *Id.* ¶ 8. At the time, eligibility for the VSA required that an employee either (1) have at least five years of service and be age 50 or older by December 31, 2022, or (2) have at least one year of service and a combined age-and-service total of 60 or more by that date. *Id.* ¶ 9. Plaintiff satisfied both eligibility criteria. [ECF No. 16, at 2].

Attached to the VSA was a "Voluntary Separation Program Information Addendum," which included an "Employee Questions and Answers" ("Q&A") document. [ECF No. 1-1, at 12–14]. In response to the question "Will I be eligible for rehire?", the document answered affirmatively and stated that qualified former employees were "encouraged to apply" for future vacancies. *Id.* at 14; [ECF No. 1, ¶¶ 11–12].

In March 2024, Plaintiff applied for a Field Service Manager position with Cornerstone. *Id.* ¶ 14. She excelled in the interview process and was notified by Jeff Holloway, the Director of Field Services, that he was prepared to extend an offer, subject to approval from Human Resources ("HR"). *Id.* ¶ 15. On April 16, 2024, however, Mr. Holloway informed Plaintiff that HR had blocked the hire. *Id.* ¶ 16. He explained that Kelly Louks, an HR manager, had advised him that Plaintiff was not eligible for rehire, relaying that Cheryl Mikolay, the Vice President of HR, had directed that individuals who entered into a VSA were categorically barred from rehire. *Id.* "Mr. Holloway expressed his disappointment in being unable to hire Plaintiff, because he felt she was

2

the best candidate." *Id.* ¶ 18.

Seeking clarification, Plaintiff emailed Ms. Mikolay. *Id.* ¶ 19. On April 18, 2024, at 2:33 p.m., Ms. Mikolay replied that she "need[s] to connect with the team to further understand the situation" and that "someone will be in touch." *Id.* ¶ 20. Approximately one hour later, Mr. Holloway contacted Plaintiff by phone to tell her that he had hired another candidate. *Id.* ¶ 21. The candidate selected "was significantly younger and less qualified for the position than Plaintiff." *Id.*

On April 23, 2024, Plaintiff spoke with Ms. Mikolay by phone. *Id.* ¶ 22. During the call, "Ms. Mikolay told Plaintiff directly that it was a violation of Cornerstone policy to extend an offer because she had entered into a VS[A] . . . and that the position was given to another candidate . . . that was not affected by this 'policy.'" *Id.* ¶ 23.

At that time, Plaintiff was working for Cornerstone as a contractor through Addison Group, a staffing company that "specializes in providing temporary workers to companies on a contract basis." *Id.* ¶ 27.  On April 17, 2024, Plaintiff contacted Sidney Stevens with Addison Group to express her concern that Cornerstone might retaliate against her for questioning the purported policy by terminating her contract. *Id.* ¶¶ 28–30. Those concerns materialized shortly thereafter. On April 24, 2024—just one day after her conversation with Ms. Mikolay—"Plaintiff was notified via Teams meeting with Alyssa Leonard and Casey Retke, human resources employees for Cornerstone, that they would be ending her Addison Group contract with Cornerstone effective immediately." *Id.* ¶ 32. Plaintiff promptly notified Ms. Stevens, who indicated that Cornerstone had acted unilaterally without consulting Addison Group. *Id.* ¶ 33.

"On May 3, 2024, Plaintiff had a follow-up call with Ms. Stevens to inquire as to the reason for the abrupt termination of her contract with Cornerstone."  *Id.* ¶ 34. Ms. Stevens explained that the termination was related to the VSA that Plaintiff had signed. *Id.* Although Plaintiff later secured

3

new employment, it was at a significantly reduced salary. *Id.* ¶ 36.

Plaintiff seeks damages resulting from Cornerstone's alleged wrongful conduct, including lost wages, emotional distress, punitive damages to the fullest extent permitted by West Virginia law, attorney's fees and costs, pre- and post-judgment interest, and any other relief the court deems appropriate. *Id.* ¶ 64.

Cornerstone now moves to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) or, alternatively, to transfer venue pursuant to 28 U.S.C. § 1404(a). [ECF No. 8]. Cornerstone argues that the forum-selection clause in the parties' VSA requires that disputes "arising from or related in any way to" the agreement or Plaintiff's employment be brought exclusively in state or federal courts in Harris County, Texas, or Wake County, North Carolina. [ECF No. 14, at 1, 7]. Cornerstone contends that because Plaintiff filed suit in the Southern District of West Virginia, venue is improper and the case should be dismissed or transferred. *Id.*

Plaintiff opposes Cornerstone's motion, arguing that the forum-selection clause in the VSA is inapplicable, unenforceable, and unreasonable as applied to her claims. [ECF No. 16, at 1–2]. She contends that her claims arise independently of the VSA and concern post-employment conduct that occurred in West Virginia. She further argues that the forum-selection clause contravenes West Virginia public policy and that enforcing the forum-selection clause would be unreasonable and burdensome. *Id.* at 7–9.

## II.    LEGAL STANDARD

A defendant may move to dismiss or transfer venue under Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. §§ 1404(a) and 1406(a). Section 1406(a) and Rule 12(b)(3) apply only where venue is "wrong" or "improper," which is determined exclusively by reference to 28 U.S.C. § 1391. Under § 1391(b), venue is proper in a judicial district where (1) any defendant resides, if

4

all defendants reside in the same state; (2) a substantial part of the events or omissions giving rise to the claim occurred; or (3) if no district satisfies those requirements, where any defendant is subject to personal jurisdiction. If a case is filed in a district that does not satisfy § 1391(b), venue is improper and dismissal or transfer under § 1406(a) may be appropriate. The existence of a contractual forum-selection clause does not alter the statutory venue inquiry under § 1391. *See Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 57–59 (2013).

Where a defendant seeks to enforce a forum-selection clause, the inquiry is governed by *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), under which such clauses should be enforced unless the resisting party can show that enforcement would be "unreasonable and unjust" under the circumstances. *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 651 (4th Cir. 2010) (quoting *M/S Bremen*, 407 U.S. at 15). A forum-selection clause may be deemed unreasonable if: (1) its formation was induced by fraud or overreaching; (2) the resisting party will, for all practical purposes, be deprived of its day in court due to grave inconvenience or unfairness; (3) enforcement would deprive the plaintiff of a remedy because of the fundamental unfairness of the chosen law; or (4) enforcement would contravene a strong public policy of the forum state. *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (summarizing *M/S Bremen*, 407 U.S. at 12–13, 15, 18); *see also Albemarle Corp.*, 628 F.3d at 651. Only if the clause is valid under *Bremen* does the court proceed to the modified transfer analysis articulated in *Atlantic Marine Construction Co. v. U.S. District Court for the Western District of Texas*, 571 U.S. 49, 57 (2013).

The Supreme Court has clarified that a forum-selection clause does not render venue "improper" within the meaning of Rule 12(b)(3), because "venue is proper so long as the requirements of § 1391(b) are met . . . ." *Atl. Marine*, 571 U.S. at 57. Accordingly, dismissal under

Rule 12(b)(3) or § 1406(a) is not the appropriate mechanism for enforcing a valid forum-selection clause pointing to another federal forum. Instead, the proper mechanism is transfer pursuant to 28 U.S.C. § 1404(a). *Id.* at 59.

Section 1404(a) permits a district court to transfer a civil action "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion (or a *forum non conveniens* motion) must evaluate both the convenience of the parties and various public-interest considerations." *Atl. Marine*, 571 U.S. at 62. That includes "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015). Generally, a plaintiff's choice of venue is entitled to substantial weight, and the decision whether to transfer lies within the sound discretion of the district court. *Id.*; *Vass v. Volvo Trucks N. Am., Inc.*, 304 F. Supp. 2d 851, 857 (S.D. W. Va. 2004); *see also FTC v. Pukke*, 53 F.4th 80, 110 (4th Cir. 2022) ("Once a suitable venue is found, the decision whether to transfer is left to the discretion of the trial court."); *accord Plumbing Servs., Inc.*, 791 F.3d at 443 ("We review decisions on whether to transfer venue under 28 U.S.C. § 1404 for abuse of discretion.").

The analysis veers decidedly, however, when there is "a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Atl. Marine*, 571 U.S. at 63 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)); *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 209 (4th Cir. 2022). Where a valid forum-selection clause exists, courts "should ordinarily transfer the case to the forum specified," absent extraordinary

6

circumstances unrelated to the convenience of the parties. *Atl. Marine*, 571 U.S. at 62. Where there is a valid and applicable forum-selection clause, the court must adjust the § 1404(a) analysis in three respects. *Id.* at 63. First, the plaintiff's choice of venue receives no weight and "the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* Second, the district court "should not consider arguments about the parties' private interests." *Id.* at 64. "Third, when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." *Id.* As a result, only public-interest factors may weigh against transfer, and those factors will "rarely defeat a transfer motion." *Id.* at 64. Such factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 64 n.6; *see also Jiali Tang v. Synutra Int'l, Inc.*, 656 F.3d 242, 249 (4th Cir. 2011).

Importantly, *Atlantic Marine* is clear that its analytical framework "presupposes a contractually valid forum-selection clause." *Atl. Marine*, 571 U.S. at 68 n.5. Thus, where a clause is invalid under *Bremen*, it is not entitled to controlling weight, and the court proceeds under the ordinary § 1404(a) analysis without the adjustments mandated for valid clauses.

## III.    DISCUSSION

Cornerstone moves to dismiss under Rule 12(b)(3) for improper venue or, in the alternative, to transfer under 28 U.S.C. § 1404(a). I conclude that Cornerstone's request for dismissal is foreclosed by *Atlantic Marine*, which makes clear that a forum-selection clause does not render venue "improper" within the meaning of Rule 12(b)(3) where the requirements of § 1391(b) are

7

otherwise satisfied. *Atl. Marine Constr. Co.*, 571 U.S. at 57–59. Because I find venue is proper in this district under 28 U.S.C. § 1391(b)(2), Cornerstone's motion to dismiss is **DENIED**.

I now turn to whether transfer is warranted pursuant to 28 U.S.C. § 1404(a).

### A.   Applicable Law

The parties' dispute centers on whether the forum-selection clause contained in the VSA governs Plaintiff's claims and, if so, whether it must be enforced. Before addressing enforceability under *Bremen*, I must first determine the scope of the clause. For the reasons that follow, I conclude that Plaintiff's claims do not fall within the clause's scope. Accordingly, Cornerstone's motion to transfer fails at this threshold interpretive stage, and I do not reach the question of enforceability.

The text of the VSA confirms that conclusion. In exchange for severance benefits, the Agreement required Plaintiff to provide a complete release of "any and all" claims that she had "from the beginning of time to the Effective Date [i.e., November 16, 2022] of this Agreement." [ECF No. 1-1, at 2].[1] In addition to the release of claims, the VSA included a forum-selection clause and jury-waiver provision, which provides:

> The Company and I consent to the personal jurisdiction in the State of Texas and North Carolina and agree that the exclusive, mandatory venue for any disputes, lawsuits, actions and/or proceedings arising from or related in any way to this Agreement or my employment is in the state and/or federal courts in Houston, Harris County, Texas, or Cary, Wake County, North Carolina. The parties further agree that in any action to enforce this Agreement or otherwise related to my employment, all such matters shall be tried solely before a judge and not a jury, and THE PARTIES EACH AGREE TO WAIVE THEIR RIGHT TO A JURY TRIAL IN ALL SUCH CASES.

*Id.* at 5 (emphasis in original). The VSA also contained a choice of law provision stating:

---

[1] The release further provides: "For avoidance of doubt, I acknowledge that the release contained in this Agreement does not apply to any claims that may arise under the Age Discrimination in Employment Act after the date that I sign this Agreement." [ECF No. 1-1, at 2]. Plaintiff, however, does not assert a claim under the federal Age Discrimination in Employment Act. She brings only the state law claims described above.

> This Agreement shall be interpreted and enforced under the laws of the State of North Carolina, without regard to its conflict of laws provisions or the conflict of laws provisions of any other jurisdiction which would cause the application of any law other than that of the State of North Carolina.

*Id.* at 4.

The parties devote little attention to the Agreement's choice of law provision or to the analytical distinction between the interpretation and enforceability of forum-selection clauses. That distinction matters here. As several courts of appeals have recognized, interpretation and enforceability present separate inquiries. Interpretation concerns the meaning and scope of the clause, *i.e.*, what claims the parties agreed it would govern. Enforceability concerns whether the clause, once construed, should be given effect under *Bremen* and its progeny. *See, e.g.*, *Martinez v. Bloomberg, LP*, 740 F.3d 211, 224 (2d Cir. 2014) ("[Q]uestions of enforceability are resolved under federal law, while interpretive questions—questions about the meaning and scope of a forum selection clause—are resolved under the substantive law designated in an otherwise valid contractual choice-of-law clause."); *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 58 (3d Cir. 2018) ("Federal law controls the question of whether to enforce a forum selection clause. However, the interpretation of a forum selection clause is an analytically distinct concept from the enforceability of that clause. The question of the scope of a forum selection clause is one of contract interpretation.") (internal quotation marks and citations omitted); *see also Collins v. Mary Kay, Inc.*, 874 F.3d 176, 182−83 (3d Cir. 2017) (collecting cases).

Other circuits have taken a different approach, applying a single body of law to both questions. *See Abbott Labs. v. Takeda Pharm. Co.*, 476 F.3d 421, 423 (7th Cir. 2007) ("Simplicity argues for determining the validity and meaning of a forum selection clause . . . by [sole] reference to the law of the jurisdiction whose law governs the rest of the contract in which the clause appears, rather than making the court apply two different bodies of law in the same case."); *Manetti-*

*Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 513 (9th Cir. 1988) ("Moreover, because enforcement of a forum clause necessarily entails interpretation of the clause before it can be enforced, federal law also applies to interpretation of forum selection clauses.").

The Fourth Circuit has not adopted either approach by name. Its most relevant guidance comes from *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643 (4th Cir. 2010), in which it emphasizes that forum-selection clauses must be "taken in context" of any accompanying choice of law provisions to "give effect to the parties' agreement." *Id.* at 649–51. That instruction points in the same direction as the first framework: the choice-of-law provision is not irrelevant to the interpretive task.

*Albemarle*, however, did not resolve the question of scope. The dispute there concerned whether the forum-selection clause was mandatory or merely permissive—a question of enforceability. The court held that the parties' contractual choice of English law supplied the answer: under English law, language that might otherwise be considered permissive under federal common law was construed as mandatory and exclusive. *Id.* at 651. Thus the "context" provided by the choice-of-law provision was limited to determining whether the clause was mandatory, and the parties had stipulated to the effect of applying English law. *Id.*

*Albemarle* therefore leaves open whether, in the Fourth Circuit, the scope of a forum-selection clause is governed by the parties' chosen law or by federal common law. I need not resolve that question definitively here, because under either North Carolina law or federal common law, the interpretive analysis yields the same result.

### B. *Interpretation and Scope*

The threshold question is one of contract interpretation: does the VSA's forum-selection clause extend to Plaintiff's claims? Under both federal and North Carolina law, the starting point

is the "plain language" of the agreement itself. *Bartels by & through Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 674 (4th Cir. 2018); *Galloway v. Snell*, 384 N.C. 285, 287, 885 S.E.2d 834, 836 (2023) ("Written contracts are to be construed and enforced according to their terms." (internal quotation marks omitted)).

Here, the forum-selection clause applies to "any disputes . . . arising from or related in any way to this Agreement or [Plaintiff's] employment . . . ." [ECF No. 1-1, at 5]. The word "any" is among the broadest quantifiers available to a drafter. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997). Likewise, the phrase "related in any way to" sweeps more broadly than the familiar formulations "arising out of" or "relating to" that North Carolina and federal courts have already construed. *See, e.g.*, *Premier Athlete Advisors LLC v. EnterSports MGT LLC*, 301 N.C. App. 405, 413, 924 S.E.2d 41, 48 (2025) (describing the scope of arbitration clauses using "arising out of or relating to" language as "broad and unambiguous"); *Maldini v. Marriott Int'l, Inc.*, 140 F.4th 123, 136 (4th Cir. 2025) (recognizing that "'arising out of or related to' language sweeps especially broadly"); *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996) (finding tort claims fell within scope of clause covering matters "arising out of or related to" contract); *see J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) (contrasting clauses that cover only claims "arising under" a contract with broader language extending also to claims "related to" a contract).

Breadth, however, is not limitless. The breadth of the clause does not eliminate the requirement that a qualifying dispute bear some relationship to the Agreement or Plaintiff's employment. The word "any" modifies "disputes," making clear that every dispute satisfying the relational language that follows is covered, without regard to the legal theory asserted or the subject matter involved. The phrase "in any way," by contrast, addresses the degree of connection

11

required. It broadens the range of relationships sufficient to bring a dispute within the clause, but it does not eliminate the need for a connection altogether.

Had the parties intended to dispense with any relational limitation, they easily could have done so. They could have agreed to litigate "any disputes whatsoever" or "any disputes between the parties," regardless of subject matter. They did not. Instead, they chose language tethering covered disputes to "this Agreement" or Plaintiff's employment. *See U.S. ex rel. Welch v. My Left Foot Child.'s Therapy, LLC*, 871 F.3d 791, 797–98 (9th Cir. 2017) (finding that, although a broader "any and all disputes whatsoever" formulation was available, the inclusion of a narrower provision controlled, under the canon that the specific governs the general and every word is given effect).

The Fourth Circuit has drawn precisely this kind of distinction itself, contrasting a clause limited to disputes arising from a particular agreement with broader language reaching "*any aspects of the relationship between the parties*," including relationships the contract containing the clause neither created nor governed. *Wachovia Bank, Nat'l Assoc. v. Schmidt*, 445 F.3d 762, 768–69 (4th Cir. 2006) (distinguishing *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 568 (4th Cir. 1998)). The clause here more closely resembles the former than the latter. Although the phrase "related in any way to" is expansive, it remains anchored to two specific referents: "this Agreement" and "[Plaintiff's] employment." It does not purport to govern every dispute that might arise between the parties irrespective of its connection to either. Properly read, the word "any" expands the degree of relationship that will suffice; it does not eliminate the requirement that the relationship exist in the first place.

Having concluded that the clause requires some relation to the Agreement,[2] I now turn to

---

[2] Cornerstone's argument appears to focus on whether Plaintiff's claims are "related" to "this

what that relation must consist of.

### 1. Federal Common Law

The Fourth Circuit has consistently construed "arising out of or relating to" language to encompass "every dispute between the parties having a significant relationship to the contract," regardless of the label attached to the claim. *Wachovia*, 445 F.3d at 767 (quoting *Am. Recovery Corp.*, 96 F.3d at 93); *Long v. Silver*, 248 F.3d 309, 316–17 (4th Cir. 2001).

I draw the "significant relationship" standard from cases interpreting the more familiar "arising out of or relating to" formulation and extend it to the VSA's language covering disputes "arising from or related in any way to" the Agreement. The textual difference lowers the degree of relatedness required, but it does not dispense with it altogether. The phrase "in any way" confirms that the requisite relationship may be more indirect or attenuated than under a narrower formulation. It does not, however, eliminate the requirement that the dispute derive, in some meaningful sense, from the contractual relationship the Agreement itself created. *See Long*, 248 F.3d at 317–19 (holding that an arbitration clause encompassed tort and contract claims arising from the shareholder and employment relationship *created by* the agreement).

The Fourth Circuit's decision in *Wachovia* illustrates this principle. There, the court declined to compel arbitration under a promissory note even though the note was part of the same overall financial transaction that gave rise to the dispute. 445 F.3d at 767–68. The claims at issue

---

Agreement" and does not meaningfully address whether they are "related to" her "employment" within the meaning of the forum-selection clause. [ECF No. 14, at 7]. I thus confine my analysis to the former. In any event, the result would be the same under the "employment" prong. The phrase "my employment" is most naturally read to refer to the employment relationship that the VSA was intended to conclude, not a subsequent, independent application for employment years later. The VSA was the final act of Plaintiff's prior employment relationship with Cornerstone; it did not create or govern any future employment relationship. Accordingly, for substantially the same reasons discussed herein, Plaintiff's claims are not related to her employment within the meaning of the forum-selection clause.

stemmed from Wachovia's conduct as a financial advisor, governed by a separate agreement, and their resolution did not require interpretation of the note containing the arbitration clause. *Id.* The mere fact that both agreements arose from the same broader course of dealing was insufficient. What mattered was whether the claims had a significant relationship to the specific contract containing the clause. *Id.* That distinction is important here as well. The fact that the VSA appears throughout Plaintiff's factual narrative does not, standing alone, establish that her statutory claims bear the requisite relationship to the Agreement itself.

Persuasive authority from other circuits reinforces this conclusion. In *Bahamas Sales Associate, LLC v. Byers*, 701 F.3d 1335 (11th Cir. 2012), the Eleventh Circuit construed a forum-selection clause covering disputes "related in any way to" a real estate purchase agreement—the same operative language at issue here. The court rejected the proposition that a claim necessarily "relates to" a contract simply because it would not have arisen "but for" that agreement. *Bahamas Sales Assocs., LLC*, 701 F.3d at 1341. Rather, the court found that "[a] claim 'relates to' a contract when 'the dispute occurs as a fairly direct result of the performance of contractual duties.'" *Id.* at 1340–41 (quoting *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001)). As the court explained, "[t]he phrase 'related to' marks a boundary by indicating some direct relationship." *Id.* at 1341 (quoting *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011)). Otherwise, the concept of relatedness would become limitless, for "if 'relate to' were taken to extend to the furthest stretch of its indeterminacy, it would have no limiting purpose because really, universally, relations stop nowhere." *Id.* (quoting *Doe*, 657 F.3d at 1218–19); *see also U.S. ex rel. Welch*, 871 F.3d at 798 ("[B]oth of the phrases, 'arising out of' and 'related to' mark a boundary by indicating some direct relationship.").

## 2.  North Carolina Law

North Carolina's plain-meaning canon leads to the same conclusion. "North Carolina law requires a court to interpret a contract by examining its language for indications of the parties' intent at the moment of execution." *Fairview Devs., Inc. v. Miller*, 187 N.C. App. 168, 171, 652 S.E.2d 365, 367 (2007). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996). "This intention is to be gathered from the entire instrument, viewing it from its four corners." *Jones v. Palace Realty Co.*, 226 N.C. 303, 305, 37 S.E.2d 906, 907 (1946); *see also State v. Philip Morris USA Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005) ("Intent is derived not from a particular contractual term but from the contract as a whole."). "When interpreting a contract, [courts] should presume that the words of the agreement were deliberately selected and be given their plain meaning." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 385 N.C. 250, 267, 891 S.E.2d 100, 114 (2023). North Carolina courts determine the parties' intent by examining the words they deliberately selected, reading those words in the context of the agreement as a whole. *See Galloway*, 384 N.C. at 287, 885 S.E.2d at 834; *Walton*, 342 N.C. at 881, 467 S.E.2d at 411; *Jones*, 226 N.C. at 305, 37 S.E.2d at 907.

Undefined, nontechnical terms are given "a meaning consistent with the sense in which it is used in ordinary speech, unless the context clearly requires otherwise." *State v. Philip Morris USA Inc.*, 363 N.C. 623, 632–33, 685 S.E.2d 85, 91 (2009) (citation modified). In its ordinary sense, two things are "related" when they share some connection. *See Schwarz v. St. Jude Med., Inc.*, 254 N.C. App. 747, 753, 802 S.E.2d 783, 788 (2017) ("'Relating to' implies merely 'some connection or relation.'" (quoting Webster's New World College Dictionary 1225 (5th ed. 2014))). And when read in the context of the VSA as a whole, the term encompasses disputes sufficiently connected to the Agreement itself and the employment relationship it memorializes,

15

not disputes based on later conduct that the VSA neither addressed nor purported to govern. *See Jones*, 226 N.C. at 305, 37 S.E.2d at 907; *Hickox v. R&G Grp. Int'l, Inc.*, 161 N.C. App. 510, 517, 588 S.E.2d 566, 573 (2003).

North Carolina courts have applied this same principle when interpreting arbitration provisions. In *Rodgers Builders, Inc. v. McQueen*, 76 N.C. App. 16, 331 S.E.2d 726 (1985), the Court of Appeals of North Carolina held that an arbitration provision covering claims "arising out of, or relating to, the Contract Documents or the breach thereof" extended to claims with a "sufficiently strong relationship" to the contract, regardless of whether those claims sounded in tort or contract. *Id.* at 19, 26, 331 S.E.2d 728, 732. Likewise, *Bass v. Pinnacle Custom Homes, Inc.*, 163 N.C. App. 171, 592 S.E.2d 606 (2004), reaffirmed that the inquiry turns not on the legal label attached to a claim, but on the claim's relationship to the subject matter of the clause. *Id.* at 176, 592 S.E.2d at 609; *see also Epic Games, Inc. v. Murphy-Johnson*, 247 N.C. App. 54, 62–63, 785 S.E.2d 137, 143 (2016) (concluding that the use of the phrase "*in any way concerning* his employment, this [a]greement, or this [a]greement's enforcement" reflected the drafter's intent to encompass an "extensive range of issues" relating to the employee's employment or the agreement within the arbitration clause's scope).

At the same time, North Carolina courts recognize that a dispute does not fall within a contractual provision merely because the agreement forms part of the factual background giving rise to the claim. In *Fontana v. Southeastern Anesthesiology Consultants, P.A.*, 221 N.C. App. 582, 729 S.E.2d 80 (2012), the Court of Appeals of North Carolina held that claims for fraudulent inducement, fraud, and unfair trade practices were outside the scope of an arbitration clause covering "*any and all such disputes regarding termination of Employee*," even though the basis for these claims "may have contributed to creating the environment which led to plaintiff's

16

termination." *Id.* at 590, 729 S.E.2d at 87. The court held that such claims did not have a "significant or strong relationship" to the subject matter of the clause or "specifically pertain to a dispute concerning plaintiff's termination." *Id.*

Two features of the VSA and the claims asserted here confirm that Plaintiff's WVHRA and IIED claims fall outside the forum-selection clause, even under the broad relational standard described above. First, Plaintiff's claims exist independently of the VSA. Her age-discrimination and retaliation claims arise under the WVHRA, and her IIED claim arises under West Virginia common law. The elements of those causes of action are defined independently of the VSA and are enforceable regardless of whether the VSA ever existed. The alleged statutory violation, if one occurred, was complete when Cornerstone allegedly refused to hire Plaintiff because of her age and terminated her contract assignment in retaliation. No element of any claim requires interpretation of the VSA, depends upon a right or obligation the VSA created, or would fail in the VSA's absence.[3]

Second, the structure and purpose of the VSA reinforce that conclusion. The VSA is a separation agreement executed in connection with a voluntary workforce reduction program. In exchange for severance benefits, Plaintiff released claims that had accrued through a defined "Effective Date." The VSA's operative provisions are therefore backward-looking. They resolve

---

[3] The Q&A section does not appear to be part of the VSA's contractual terms. Under North Carolina law, an attached document is not incorporated by reference merely because it is attached; the contract must contain express language incorporating the document. *See Montessori Child.'s House of Durham v. Blizzard*, 244 N.C. App. 633, 637, 781 S.E.2d 511, 514 (2016). Here, the VSA's integration clause provides that the "Agreement (including addendums and exhibits) constitutes the entire agreement of the Parties," but it does not identify or incorporate the Q&A document. [ECF No. 1-1, at 4]. By contrast, the VSA expressly incorporates other documents by name, including the California Addendum and the "Non-Solicitation and Non-Recruitment" exhibit. *Id.* at 4, 7. The absence of similar incorporation language for the Q&A document suggests that it was included as an informational handout, not as a source of contractual rights or obligations.

17

an existing employment relationship; they do not establish or govern a future one.

Plaintiff's subsequent application for employment was an independent act, and the ensuing hiring decision did not arise from Cornerstone's interpretation or enforcement of the Agreement. Rather, Cornerstone allegedly pointed only to the existence of the Agreement—not any particular contractual provision—as the basis for its decision, which Plaintiff contends was merely a proxy for age. Nothing in the Agreement, including the accompanying Q&A's discussion of rehire eligibility, undertakes to govern future hiring decisions or to channel future statutory disputes concerning those decisions into a particular forum.

Nor is it evident that, when the parties executed the VSA, they intended to channel into a Texas or North Carolina court any claims arising from a separate application for employment nearly two years later. Read as a whole, the VSA reflects the parties' intent to resolve their prior employment relationship, not to prescribe the forum for every future dispute that might arise between them. The forum-selection clause likely reaches disputes over severance benefits, the scope of the release, or the parties' respective obligations under the Agreement. It does not naturally extend to an independent hiring decision made by different decisionmakers during a separate hiring process that the VSA neither contemplated nor purported to regulate.

One final observation confirms this reading. Under Cornerstone's interpretation, the scope of the forum-selection clause would depend not on the VSA itself, but on Cornerstone's own characterization of its later conduct. Any time Cornerstone invoked the VSA as a justification for a future employment decision, any resulting statutory claim would automatically become "related" to the Agreement and therefore subject to the forum-selection clause. The clause would become self-expanding: its reach would grow simply because one party elected to cite the VSA as the reason for its challenged conduct. At this stage, however, Cornerstone has not identified any

18

provision of the VSA that governed its hiring decision, rendered Plaintiff ineligible for reemployment, or supplied a nondiscriminatory basis for its decision. Such an interpretation has no discernible limiting principle and would transform a separation agreement designed to resolve a prior employment relationship into a standing venue provision governing future disputes that arise from entirely new conduct. That concern is not merely theoretical here. Plaintiff's central allegation is that Cornerstone's asserted reliance on the VSA was itself pretextual—that the VSA was invoked as a facially neutral explanation to conceal unlawful age discrimination. I decline to adopt an interpretation of the forum-selection clause that would allow the clause's scope to expand based solely on a party's unilateral reliance on the Agreement as a justification for later conduct.

I conclude that Plaintiff's claims do not bear the relationship to the VSA that the forum-selection clause requires and as such, do not fall within its scope. Accordingly, Cornerstone's motion to transfer venue based on that clause is **DENIED**.

### C. 1404(a) Analysis

Nevertheless, in the absence of an enforceable forum-selection clause, the court may still "[f]or the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion (or a forum non conveniens motion) must evaluate both the convenience of the parties and various public-interest considerations." *Atl. Marine Const. Co.*, 571 U.S. at 62. That includes "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund*, 791 F.3d at 444. Generally, a plaintiff's choice of venue is entitled to substantial weight, and the decision

whether to transfer lies within the sound discretion of the district court. *Id.*; *Vass*, 304 F. Supp. 2d at 857; *see also Pukke*, 53 F.4th at 110 ("Once a suitable venue is found, the decision whether to transfer is left to the discretion of the trial court.").

This case "might have been brought" in the federal courts of North Carolina, specifically the Eastern District of North Carolina. First, venue is proper where any defendant resides. 28 U.S.C. § 1391(b). A corporation is deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Id.* § 1391(c)(2). Cornerstone's principal place of business is in Cary, North Carolina. Therefore, venue is proper in the Eastern District of North Carolina.

Second, the Complaint alleges diversity jurisdiction. [ECF No. 1, ¶ 3]. There is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000. Therefore, the Eastern District of North Carolina has subject-matter jurisdiction.  Third, the Eastern District of North Carolina may exercise personal jurisdiction over Cornerstone. *See Fidrych v. Marriot Int'l Inc.*, 952 F.3d 124, 133 (4th Cir. 2020). ("[Personal] jurisdiction may be exercised when the defendant has contacts with the forum jurisdiction that are 'so constant and pervasive as to render it essentially at home in the forum State.'" (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014))). The Eastern District of North Carolina is thus a district where the case "might have been brought."

The analysis now turns to the convenience of the parties and the public-interest considerations identified above. First, I accord substantial weight to Plaintiff's choice of forum, the Southern District of West Virginia. Plaintiff resides in this district, worked in this district throughout the relevant period, and alleges injuries arising from employment performed in this district. Her choice of forum is therefore entitled to considerable deference.

20

As to the remaining factors—witness convenience and access, convenience of the parties, and the interest of justice—Cornerstone has made little showing that transfer would materially advance any of them. Cornerstone identifies no witnesses who would be unavailable in this district, no categories of evidence that would be more readily accessible in North Carolina, and no particular burden that litigating in this district would impose on the parties. Nor has Cornerstone identified any public-interest consideration that weighs strongly in favor of transfer. To the contrary, West Virginia has a substantial interest in adjudicating claims brought under the WVHRA by an employee who lived and worked in West Virginia during the relevant period.

Because the party seeking transfer bears the burden of demonstrating that transfer is warranted, and because Cornerstone has not shown that the balance of conveniences and the interests of justice outweigh Plaintiff's choice of forum, I decline to transfer this action under 28 U.S.C. § 1404(a). Cornerstone's motion to transfer is therefore **DENIED**.

### D.  Jury Waiver

Lastly, the VSA contains a jury-trial waiver, which provides: "The parties further agree that in any action to enforce this Agreement or otherwise related to my employment, all such matters shall be tried solely before a judge and not a jury, and THE PARTIES EACH AGREE TO WAIVE THEIR RIGHT TO A JURY TRIAL IN ALL SUCH CASES." [ECF No. 1-1, at 5]. Cornerstone argues that, based on the plain language of the waiver, Plaintiff waived her right to a jury trial. [ECF No. 14, at 10].

Courts generally construe contractual jury-trial waivers "broadly to encompass both contract claims and related tort claims where the causes of action would not exist were it not for the relationship between [the parties], as well as counterclaims whether or not arising from the contract at issue." *Zaklit v. Glob. Linguist Sols., LLC*, 53 F. Supp. 3d 835, 856–57 (E.D. Va. Sept.

16, 2014). As explained above, this action is not brought to enforce the VSA, nor does Plaintiff's WVHRA and IIED claims relate to her employment in the manner contemplated by the Agreement. The parties appear to agree that the phrase "my employment," as used in the VSA, refers to Plaintiff's prior employment relationship with Cornerstone. *See* [ECF No. 16, at 11 ("Plaintiff's Complaint is not 'otherwise related to her employment,' in that Plaintiff's employment ended with Defendant in November 2022, and there are no claims in the Complaint related to her former employment with Defendant.")]; *see also* [ECF No. 17, at 9 ("Because Plaintiff's claims depend entirely on her *former employment relationship* and its alleged consequences, the jury-trial waiver applies." (emphasis added))].

Plaintiff's claims arise from Cornerstone's alleged decision not to hire Plaintiff for a subsequent position and the alleged reasons underlying that decision. Although Plaintiff's prior employment relationship with Cornerstone provides factual context for her claims, the claims do not relate to that relationship in the manner contemplated by the Agreement for the reasons explained above. Accordingly, the jury-trial waiver does not apply.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss for improper venue or, in the alternative, to transfer venue pursuant to 28 U.S.C. § 1404(a) is **DENIED**. Additionally, the parties jointly move to extend the scheduling order deadlines as the court considers the motion to transfer. [ECF No. 23]. Having denied that motion, the Joint Motion to Extend Scheduling Order Deadlines, [**ECF No. 23**], is **DENIED as moot.**

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

22

The court further **DIRECTS** the Clerk to post a copy of this published order on the court's website, www.wvsd.uscourts.gov.

ENTER:　　　July 27, 2026

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

23